UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE                    )
ADVANCEMENT OF COLORED PEOPLE                   )
1156 15th St., NW, Ste. 915                     )
Washington, DC 20005;                           )
                                                )
COMMON CAUSE                                    )
805 15th St., NW, Ste. 800                      )
Washington, DC 20005;                           )
                                                )
COMMON CAUSE EDUCATION FUND                     )
805 15th St., NW, Ste. 800                      )
Washington, DC 20005;                           )
                                                )
BLACK VOTERS MATTER FUND, INC.                  )
3645 Marketplace Blvd., Ste. 130-236            )
Atlanta, GA 30344;                              )
                                                )
*and*                                           )
                                                )
BVM CAPACITY BUILDING INSTITUTE, INC.,          )
4751 Best Rd., Ste. 200                         )
Atlanta, Georgia 30337,                         )
                              *Plaintiffs,*     )

          v.
                                                )
DONALD J. TRUMP,                                )
In his official capacity as President of the    )
United States                                   )
The White House                                 )
1600 Pennsylvania Ave., NW                      )
Washington, DC 20500                            )
                                                )
EXECUTIVE OFFICE OF THE PRESIDENT,              )     Case Number  1:26-cv-001151
1600 Pennsylvania Ave., NW                      )
Washington, DC 20500;                           )
                                                )
U.S. DEPARTMENT OF JUSTICE,                     )
950 Pennsylvania Ave., NW                       )
Washington, DC 20530;                           )
                                                )
U.S. POSTAL SERVICE                             )
475 L'Enfant Plaza, SW                          )
Washington, DC 20260;                           )

U.S. POSTAL SERVICE BOARD OF
GOVERNORS
475 L'Enfant Plaza, SW
Washington, DC 20260;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Ave., SE
Washington, DC 20528;

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,
5900 Capital Gateway Dr.
Prince George's County, Camp Springs, MD 20746;

SOCIAL SECURITY ADMINISTRATION,
6401 Security Blvd.
Baltimore, MD 21235;

U.S. DEPARTMENT OF COMMERCE
1401 Constitution Ave., NW
Washington, DC 20230;

TODD BLANCHE,
In his official capacity as Acting Attorney General of
the United States
950 Pennsylvania Ave., NW
Washington, DC 20530;

MARKWAYNE MULLIN,
In his capacity as Secretary of the U.S. Department of
Homeland Security
2707 Martin Luther King Jr. Ave., SE
Washington, DC 20528;

DAVID STEINER,
In his official capacity as U.S. Postmaster General
475 L'Enfant Plaza, SW
Washington, DC 20260;

JOSEPH B. EDLOW,
In his official capacity as Director of U.S. Citizenship
and Immigration Services
5900 Capital Gateway Dr.
Camp Springs, MD 20746;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

-2-

FRANK J. BISIGNANO,    )
In his official capacity as Commissioner of Social    )
Security Administration    )
6401 Security Blvd.    )
Baltimore, MD 21235;    )
    )
*and*    )
    )
HOWARD LUTNICK,    )
In his official capacity as Secretary of    )
U.S. Department of Commerce    )
1401 Constitution Ave., NW    )
Washington, DC 20230,    )
    )
    )
                                        *Defendants.*    )

## INTRODUCTION

1.    In the President's Executive Order of March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "Executive Order" or "Order"), the President attempts to usurp the power to regulate federal elections from the States and Congress, granting the U.S. Department of Homeland Security ("DHS") a veto over who can vote; directing the U.S. Postal Service ("USPS" or "Postal Service")—an independent, self-funded agency—to block election mail to and from eligible registered voters; and instructing the U.S. Department of Justice ("DOJ") to institute prosecutions of state and local election officials who permit mail-in voting by individuals not on DHS' approved list.

2.    This Order is not the President's first foray into voter suppression. On March 25, 2025, he issued Executive Order 14248 entitled "Preserving and Protecting the Integrity of American Elections," which ordered multiple federal actions restricting the right to vote, including, by requiring restrictive documentary proof of citizenship to register to vote.

This Court struck down that Order, concluding that "the President has no constitutional power over election regulation that would support this unilateral exercise of authority." *LULAC v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 74 (D.D.C. 2025). Two other District Courts reached the same conclusion. *Washington v. Trump*, No. 2:25-cv-00602, 2026 WL 73866 at *1 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, 786 F. Supp. 3d 359, 371-72 (D. Mass. 2025).

3.    Thus, despite clear rulings that he has no constitutional authority to control elections, the President issued a revised Executive Order, which is also an illegal power grab seeking to control federal elections. The decisions of this Court—and others across the country—ruled out this unconstitutional usurpation of the state and congressional power. *See LULAC*, 808 F. Supp. 3d at 73; *Washington*, No. 2:25-cv-00602, 2026 WL 73866 at *1; *California*, 786 F. Supp. 3d at 371-72. The President has no authority under the Constitution to make or change the rules for conducting federal elections. Nor may he assign DHS veto power over who may vote, or the Postal Service authority to reject election mail that does not pass his arbitrary tests.

4.    To implement its improper takeover of elections, the Executive Order creates a complicated and confusing administrative. Incorrectly seeking to invoke the authority of the Help America Vote Act, 52 U.S.C. §§ 20901 *et seq.*, the National Voter Registration Act of 1993, 52 U.S.C. §§ 20501 *et seq.,* and the Guarantee Clause of the Constitution, U.S. Const. Art. IV, § 4, the March 31, 2026, Executive Order directs the Secretary of DHS, through the Director of the U.S. Citizenship and Immigration Services ("USCIS") and in coordination with the Commissioner of the U.S. Social Security Administration

("SSA" or "Social Security"), to transmit to each state a list of residents who are U.S. citizens above the age of 18.

5.    The Order mandates that these so-called "State Citizenship Lists" be derived from federal citizenship and naturalization records, Social Security records, information from the federal Systematic Alien Verification Entitlements ("SAVE") database, and other federal databases. These federal sources are notoriously inaccurate, incomplete, and unreliable as a means to verify citizenship. And they erroneously label many eligible voters as noncitizens. SSA records, for example, lack complete citizenship data for citizens born in the United States prior to 1981 — that's more than 140 million Americans the SSA database will not verify as citizens. In addition, the lists will likely exclude as eligible voters people who have changed their names due to marriage, gender identity, or other reasons.

6.    The Executive Order mandates that DHS transmit the so-called "State Citizenship List" to state election officials no later than 60 days before each regularly scheduled Federal election or promptly upon request by a State in connection with any special Federal election. This is before the deadline even to register to vote in many states. Although DHS must adopt procedures to allow states to "routinely supplement and provide suggested modifications or amendments to" the List, no provision of the Executive Order requires DHS to use those changes in determining who can vote.

7.    To sow chaos and confusion, and to intimidate state and local officials into deferring to DHS's voter eligibility decisions, the Order directs the Attorney General to prioritize the investigation and prosecution of state and local officials and others involved in providing ballots to people deemed not eligible to vote based solely on the DHS list. The Executive

Order repeats the threat of prosecution or other adverse legal consequences three times for anyone—public officials, contractors, or anyone else—who does not embrace and implement the Administration's definition of voter eligibility.

8. The Order further requires the Postal Service to initiate rulemaking within 60 days to requires all outbound ballots to be mailed in a special envelope with a bar code. The Order provides that no later than 90 days before the election, any state may notify the Postal Service whether it "intends to allow mail-in or absentee ballots to be transmitted by the USPS" and whether it intends to submit to USPS, no fewer than 60 days before the election, a list of eligible voters who will receive a mail-in or absentee ballot to be transmitted via the USPS.

9. Thus, the Order seeks to compel States to identify to a federal entity—60 days before an election—the names and addresses of all persons who would vote via mail-in ballots.

10. Relatedly, the DOJ has filed dozens of lawsuits against states that refused to comply with the federal government's demand for voter registration lists and other voter information. By the time of this filing, three federal district courts have ruled that the federal government is not entitled to this information. The Order seeks to circumvent those court decisions on a dramatic scale. *See United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026)*; United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Ore. Feb.5, 2026); *United States v. Benson*, No. 1:25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026).

11. The Executive Order also requires that the Postal Service provide each state with a "Mail-In and Absentee Participation List" identifying residents who are enrolled with the USPS for mail-in or absentee ballots. The Postal Service must also provide unique ballot

envelope identifiers, such as bar codes, for mail-in or absentee ballots for such individuals. These rules will propose procedures for states to routinely suggest supplementations or modifications to their "Mail-In and Absentee Participation List" before any federal election. The Executive Oder does not obligate USPS to accept these changes, nor does it indicate how voters will learn whether they are on the List or how they can challenge their exclusion.

12.    The Executive Order's mandated postal service rules specify that the USPS will not transmit mail-in or absentee ballots for any individual not enrolled on the state-specific Mail-In and Absentee Participation List. The Order contains no provision requiring the Postal Service to notify a state or the voter of its decision not to deliver properly addressed and stamped mail to the intended addressee.

13.    The Order assigns the Attorney General with the responsibility to enforce the relevant statutes and requires DHS to establish within 90 days the infrastructure necessary to compile, maintain, and transmit the purported State Citizenship List. The Order directs the Social Security Commissioner to provide DHS data for use in constructing the purported list.

14.    Section 5 of the Executive Order, on "Enforcement," not only cites provisions of criminal law that the Attorney General can invoke but also directs the heads of all executive agencies to refer alleged violations to the Justice Department. The Order threatens to withhold federal funds from noncompliant states and localities.

15.    The Executive Order offers no rationale, evidence, or justification for this attempt at sweeping expansions of Presidential power. Section 1 of the Executive Order generically asserts the need to "enhance election integrity" and an aim of "reducing the risk of fraud

and protecting the integrity of Federal elections." But the Executive Order does not even purport to substantiate its claims of fraud, nor does it identify why usurping state and congressional authority is necessary to bolster the integrity of federal elections.

16. The Executive Order is a patently illegal assertion of executive power over the administration of elections. Plaintiffs respectfully request that this Court declare the Executive Order unconstitutional and permanently enjoin Defendants from carrying out its unlawful requirements.

## **PARTIES**

17. Plaintiff the National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the largest and oldest civil rights organization in the United States. Its mission is to ensure educational, social, and economic equality for all persons and to eliminate race-based discrimination. The NAACP has over two million supporters, including voters throughout the United States. It has state and regional conferences representing 48 states, with nearly 2,200 units across the United States. NAACP units include approximately 200,000 members nationwide, many of whom are Black adults and eligible voters who cast ballots by mail and plan to receive and send ballots by mail in the upcoming 2026 federal elections. The NAACP has a presence in all 50 states.

18. Consistent with its mission, the NAACP has long worked to remove all barriers of racial discrimination through democratic processes and through the enactment and enforcement of federal, state, and local laws securing civil rights, including laws related to voter registration and the equal exercise of the right to vote. The NAACP conducts robust nonpartisan voter registration and education efforts nationwide, which are a core part of its mission. As one part of these efforts, the NAACP offers registration and mail-ballot

assistance to voters nationwide. The NAACP has also brought landmark voting rights and other civil rights cases over its 117-year history and has served as amicus in many such cases. Those landmark voting rights cases include the successful defense against the disclosure of its members, constituents, and the Black community at large from legal retaliation and a recent legal settlement against the USPS to prevent mail-ballot delays. *See NAACP v. Alabama*, 357 U.S. 449 (1958); Stipulation of Settlement and Proposed Order, *National Association for the Advancement of Colored People v. United States Postal Service*, No. 20-cv-02295 (D.D.C. Dec. 17, 2021), ECF No. 170.

19.    The NAACP, its members, and supporters rely on mail service by the Postal Service, a longstanding method for accessing the ballot which will be significantly curtailed by the EO. Many members, including eligible incarcerated members amongst NAACP's membership, solely rely on mail service by the Postal Service to participate in elections. NAACP members include people with disabilities, college students, incarcerated individuals and people with criminal histories, first responders in their communities, including emergency personnel, people without access to vehicles or public transportation, people who live in remote and rural areas without easily accessible in-person voting opportunities, and active-duty enlisted U.S. military personnel, who make up 20 percent of the servicemember sector. While many states do not require voters to have a reason to vote by mail, this variety of reasons—including health conditions, advanced age, attending higher education institutions outside of voters' county of residence, living in rural areas far away from in-person polling opportunities, incarceration, and traveling during the voting period—underscore NAACP members' dependence on their states' mail-in ballot system. NAACP members register to vote,

request mail ballots, or update their mailing addresses close to election deadlines, with many members updating their information within the few days or weeks before Election Day.

20. The NAACP expends significant resources educating its members and the public regarding the state-based rules concerning voter registration and mail voting across the country. Because the Executive Order threatens to share member information across agencies and outside of the federal government, prohibits the USPS transmission of some members' mail-in ballots, and prosecutes members assisting individuals in the mail-in voting process, the NAACP must dedicate additional resources to educate voters, its members, and volunteers about mail ballot changes, the EO's impacts on voters' registration status and privacy interests, to help voters determine whether they have been wrongly deemed ineligible and why, and assist eligible voters in challenging wrongful exclusions and the denial of absentee ballots.

21. The Order threatens investigation and prosecution of individuals and entities that purportedly aid and abet "distribution of ballots to individuals who are not eligible to vote in a Federal election." Exec. Order ¶ 2(b). As an entity that assists voters in registering to vote and in addressing the mechanics of voting, including voting by mail-in or absentee ballot, this provision chills voter and voter assistance participation—a threat of significant adverse consequences if an organization helps a voter, who DHS or USPS later deems ineligible, obtain a mail-in ballot.

22. NAACP members include individuals who are and will continue to be directly affected by the Order. The NAACP, for example, has many members older than 45 or have changed their name due to marital status and are citizens and eligible to vote. When DHS

consults the SSA database to determine whether such a voter is a citizen, there is a substantial risk they will not be able to verify citizenship.

23. The Order will also harm the NAACP's mission of eliminating race-based discrimination through voter registration, mobilization, and education. The NAACP would have to take time and resources away from other organizational activities and priorities to retrain volunteers, run extensive voter education campaigns related to mail ballots and privacy rights, and frontload voter mobilization and outreach efforts earlier for the election cycle.

24. Plaintiff Common Cause is a nonprofit grassroots organization organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia. Common Cause is a nonpartisan democracy organization with nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. It has members in every congressional district. Since its founding by John Gardner 50 years ago, Common Cause has been dedicated to making government at all levels more representative, open, and responsive to the interests of ordinary people.

25. Plaintiff Common Cause Education Fund ("CCEF") was formed in 2000 as a nonprofit under the laws of the State of Delaware. CCEF provides education, engagement, and research to Common Cause members, constituents, partner organizations, and the public about voter registration and the electoral process. CCEF works to foster public engagement on democracy issues and promote effective citizen participation, which are critical for a healthy and robust democratic society. Common Cause and CCEF (together "Common Cause") bring this action jointly.

26. As part of its core mission, Common Cause works on a nonpartisan basis to expand and protect equal access to voting for all citizens on multiple fronts, including (a) partnering with other community organizations to assist voters with registration, disseminate voter education materials, and provide education and training to on-the-ground voting rights advocates nationwide; (b) advocating for nonpartisan election reforms, including, but not limited to, allowing no-excuse absentee voting, extending deadlines for submitting mail-in ballots, increasing the number of voting locations, and ensuring fair, nonpartisan redistricting processes; (c) working collaboratively with state and local election officials to address and remedy—in advance of elections—election administration problems; and (d) leading Election Protection coalitions at the national and state level that field calls from voters facing barriers in exercising their fundamental right to vote, track problems at voting sites during early voting and on Election Day, and provide assistance to such voters by engaging with local election officials and/or facilitating voters' access to counsel. Common Cause staff and volunteers dedicate significant time and effort to educating and supporting voters close to election deadlines, including registration deadlines, mail-in ballot request deadlines, and mail-in ballot return deadlines so that voters are registered and can cast their ballot by mail in time.

27. Common Cause has nearly one million members nationwide and in every congressional district. All members have an interest in protecting their sensitive data that the Order seeks to unlawfully compile and share across state and federal agencies. Many members—such as those who have changed their names or become naturalized citizens—have reason to fear that errors in government databases used to compile the lists required by the Executive Order will lead to their wrongful purging from state voter rolls.

28.     Common Cause's membership also includes members who regularly vote by mail in accordance with their state's laws, either because they choose to do so or because they cannot vote in person. Many Common Cause members vote by mail because of health, advanced age, school attendance, transportation issues to in-person polling locations, residency in rural areas far from them, and other reasons. For many of these members, changes in their voter registration or mailing address close to state deadlines would prevent them from being able to use USPS services to transmit their ballot. Additionally, many Common Cause members support other voters who rely primarily or solely on mail-in voting, including elderly, hospitalized, college students, and incarcerated voters. Defendants' actions are likely to deprive many members and the voters they support of their fundamental right to vote, by creating obstacles to, or prohibiting, the delivery of their mail-in ballots both to them and then to local election officials.

29.     Common Cause has a relatively small number of employees and a limited budget. The organization relies on its member volunteers for many activities. It must make difficult choices about how to use and allocate its limited resources. As a result of the Executive Order Common Cause must expend additional resources training or retraining its volunteers about the options available to voters who fear that they have been or may be wrongfully deemed ineligible to vote; that their privacy rights have been or will be invaded from the data disclosures that the Order requires; that the USPS will deny the transmission of voters' ballots prohibiting them from exercising their fundamental right to vote; or that they may experience prosecution for mail ballot voter assistance. The time and resources spent on such training is diverted from other activities Common Cause would undertake to advance its mission. The Order will make it necessary for some

voters to correct errors in federal databases—on extremely abbreviated timelines without notice of errors and without clear procedural means—to prove their citizenship, eligibility to vote, and eligibility to vote by mail before USPS will mail their ballots. In doing so, the Order harms Common Cause's mission of reducing barriers to voting and imposes additional burdens on Common Cause to educate and assist voters to recognize and deal with the new obstacles. The burdens take time and resources away from efforts on other issues, including, but not limited to, direct voter assistance, Election Protection coordination, ensuring the safety and proper administration of in-person polling places, and advocating for expanded access to early voting, and no-excuse absentee voting.

30. Plaintiffs Black Voters Matter Fund and Black Voters Matter Capacity Building Institute (together "BVM"), formed under Section 501(c)(4) and Section 501(c)(3) of the Internal Revenue Code respectively, are nonpartisan civic organizations whose goals are to increase power in communities of color. Effective voting allows a community to determine its own destiny. Communities of color often face barriers to voting that other communities do not, so Plaintiff focuses on removing those barriers. BVM works on increasing voter registration and turnout, and advocating for policies to expand voting rights and access. BVM is particularly active in the rural American South, where voters of color tend to be the most neglected and face higher rates of poverty.

31. As part of its core mission, BVM works to ensure that voters of color are informed, engaged, and able to exercise their right to vote effectively, recognizing that civic participation enables communities of color to determine their own futures.

32. BVM is active year-round, frequently hosting voter education programming, voter registration drives, and get-out-the-vote efforts. BVM also engages in policy advocacy to

-14-

expand and protect access to the ballot, including advocating for expanded access to absentee voting in the southern states.

33.  Confusion regarding, or the reduction in access to, voting by mail would directly impair BVM's ability to carry out its core mission of building political power in marginalized communities in rural areas. BVM's work emphasizes informed participation, voter education, and the removal of structural barriers that prevent voters facing economic or logistical obstacles from consistently and effectively exercising their right to vote.

34.  As BVM works to ensure access to expanded voting options, uncertainty or diminished availability of vote-by-mail would undermine their voter education efforts, reduce meaningful participation among the voters it serves, and frustrate its advocacy for equitable and accessible election systems. The Order weakens BVM's broader strategy of empowering communities to determine their own political destinies and ensuring their ability to vote using the most accessible method.

35.  The Order threatens investigation and prosecution of individuals and entities that purportedly aid and abet "distribution of ballots to individuals who are not eligible to vote in a Federal election." Exec. Order ¶ 2(b). As an entity that assists voters in registering to vote and in addressing the mechanics of voting, including voting by mail-in or absentee ballot, BVM reads this provision as a chilling threat of significant adverse consequences if the organization helps a voter obtain a ballot and DHS or USPS later deems that voter ineligible.

36.  Defendant Donald J. Trump is the President of the United States. He is named in his official capacity.

37. Defendant Executive Office of the President ("EOP"), is an agency headquartered in Washington, D.C., through which the President carries out many of his official actions.

38. Defendant Todd Blanch is the Acting Attorney General of the United States. He is named in his official capacity.

39. Defendant U.S. Department of Justice is an agency of the federal government headquartered in Washington, D.C.

40. Defendant Markwayne Mullin is the Secretary of the U.S. Department of Homeland Security. He is named in his official capacity.

41. Defendant U.S. Department of Homeland Security is a federal agency headquartered in Washington, D.C.

42. Defendant David Steiner is the Postmaster General of the United States. The Postmaster General is the chief executive officer of USPS and actively manages the day-to-day operations of USPS. *See* 39 U.S.C. § 203. He is named in his official capacity.

43. Defendant U.S. Postal Service is a federal "independent establishment" headquartered in Washington, D.C. *See* 39 U.S.C. § 201.

44. Defendant Board of Governors of USPS is responsible for directing and controlling the expenditures, reviewing the practices and policies of the USPS, and performing other legal duties. 39 U.S.C. § 205(a).

45. Defendant Joseph B. Edlow is the Director of the U.S. Citizenship and Immigration Services. He is named is his official capacity.

46. Defendant U.S. Citizenship and Immigration Services is a federal agency within DHS headquartered in Camp Springs, Maryland.

47.    Defendant Frank J. Bisignano is the Commissioner of the U.S. Social Security Administration. He is named in his official capacity.

48.    Defendant U.S Social Security Administration is a federal agency headquartered in Baltimore, Maryland.

49.    Defendant Howard Lutnik is the Secretary of the U.S. Department of Commerce. He is named in his official capacity.

50.    Defendant U.S. Department of Commerce is a federal agency headquartered in Washington, D.C.

## JURISDICTION AND VENUE

51.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346 (civil actions against the United States) because this action arises under the Constitution and laws of the United States and the Defendants in this action are the President and various U.S. officers in their official capacities.

52.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(A) because the Defendants are officers or employees of the United States acting in their official capacity or under color of legal authority, and at least one of them resides in this District. Venue is also proper under Section 1391(e)(1)(C) because Plaintiffs NAACP and Common Cause reside in this District and no real property is involved in the action.

53.    This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

54.    Sovereign immunity for nonmonetary relief is waived by 5 U.S.C. § 702.

**FACTUAL ALLEGATIONS**

I.     **FEDERAL LAW VESTS THE POWER TO REGULATE ELECTIONS EXCLUSIVELY IN THE STATES AND IN CONGRESS—NOT THE PRESIDENT.**

A.     **The Constitution Gives No Authority to the President to Regulate Federal Elections**

55.    The President "has no legislative power," save the veto power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring). Therefore, the President's authority to issue an executive order "must stem either from an act of Congress or from the Constitution itself." *Id.* at 585.

56.    When the President acts in a manner "incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (Jackson, J., concurring). The President may not "seiz[e] the power of the Legislature" by enacting a policy via an executive order that "Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

57.    The President's order attempts to control state voter rolls, give power to the USPS to deny ballots, and dictate how states conduct absentee and mail-in voting, but neither the Constitution nor Congress has extended that power to the President. Rather, the regulation of elections is a power of the States and Congress.

58.    The Elections Clause of the U.S. Constitution establishes lawmaking powers of Congress and the States with respect to *how* federal elections are run. It unequivocally and clearly provides that "[t]he Times, Places and Manner of holding [federal] Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4; *see also Arizona v. Inter Tribal Council of Ariz., Inc. (ITCA)*, 570 U.S. 1, 7-8 (2013).

59. The Qualifications Clause allocates power to the States to determine *who* may vote in federal elections. It provides that voters for the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment extends the same requirement to the election of U.S. Senators. U.S. Const. amend. XVII. Under these provisions, the power to prescribe voter qualifications belongs exclusively to the States: each State determines who may vote in its federal elections by reference to the qualifications it has established for voters in elections to its own most numerous legislative chamber. *See Oregon v. Mitchell*, 400 U.S. 112, 124–25 (1970) (opinion of Black, J.). "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government.'" *ITCA*, 570 U.S. at 17.

60. Other provisions in the Constitution place additional requirements and limitations on the regulation of elections. The Seventeenth Amendment also requires that States hold elections for U.S. Senators, *see* U.S. Const. amend. XVII, and the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments prohibit abridging the right to vote based on sex, age, race, or a poll tax requirement, *see id.*, amends. XV, XIX, XXIV, XXVI. And constitutional principles of free speech, free association, equal protection, and due process enshrined in the First and Fourteenth Amendments establish a federal constitutional right to vote free from excessive burdens. *See id.*, amends. I, XIV; *see, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

61. Neither the Elections Clause nor any other clause of the Constitution grants the President *any* control over the conduct of elections. *State v. Meadows*, 88 F.4th 1331, 1347 (11th

-19-

Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024). "The Constitution [thus] empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* at 1346 (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)).

62.    The Constitution's allocation of authority over federal elections between Congress and the States "is no accident." *LULAC*, 808 F. Supp. 3d at 44. "[T]his design was the product of carefully considered compromises among our Constitution's Framers." *Id.*

63.    Through the Elections Clause, the Framers "'submitted the regulation of elections for the federal government, in the first instance,' to the States, where such regulation would 'be both more convenient and more satisfactory.' But they 'reserved to [Congress] a right to interpose' regulations of its own where the need arose." *Id.* at *4 (quoting Federalist No. 59). "In short, as they so often did, the Framers chose balance." *Id.*

64.    The President is "conspicuous[ly] absen[t]" from this historical context. *Id.* The Framers bestowed upon the States the "initial authority to regulate elections" and "supervisory authority over those regulations" to Congress. *Id.* But the President "does not feature at all." *Id.*

B.    **Congress's Statutory Pronouncements Give No Authority to the President to Regulate Federal Elections**

65.    Pursuant to its supervisory constitutional authority, Congress has exercised its legislative power directly by determining the rules for federal elections by statute, and indirectly by delegating to an independent federal agency the limited power to set rules within the narrow areas prescribed by Congress. Throughout our nation's history and pursuant to the Constitution, where Congress has not legislated or delegated, the States have set the election rules—including those governing federal elections — themselves.

66. Congress has exercised its Elections Clause authority to establish a uniform nationwide date for federal elections; prohibit discrimination in the administration of elections; safeguard the rights of overseas and military voters; establish uniform methods of voter registration in federal elections and regulate maintenance of state voter rolls; require states to provide provisional ballots; establish federal standards for election administration, including voting systems, provisional voting, and voter registration databases; and provide federal funding for state compliance. *See, e.g.*, 52 U.S.C. §§ 10101(a)(2), 10301; 52 U.S.C. §§ 20501-20511 (National Voter Registration Act); 52 U.S.C. §§ 20901-21145 (Help America Vote Act); 52 U.S.C. §§ 20301-20311 (Uniformed and Overseas Citizens Absentee Voting Act); 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.

67. Particularly relevant here, Congress has assigned the responsibility to manage voter registration to the States and a federal agency, the Election Assistance Commission, through the NVRA and HAVA. The NVRA requires each state to establish procedures for registering voters in federal elections by mail, at motor vehicle agencies, and at other designated state offices. 52 U.S.C. §§ 20503-20506. States must "accept and use" a uniform federal registration form—the Federal Form—that is developed and maintained by the Election Assistance Commission ("EAC"). *Id.* §§ 20505(a)(1), 20508. The EAC, in consultation with the States, prescribes the contents of the Federal Form, including what information applicants must provide to establish their eligibility. *Id.* § 20508(a)(2). The NVRA likewise assigns States the responsibility of maintaining voter registration rolls through a set of compressive and carefully limited instructions.

68. HAVA builds on the NVRA's framework by establishing requirements for statewide voter registration systems. *Id.* §§ 20901-21145. HAVA directs each state to implement a

"single, uniform, official," statewide voter registration list that is "defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). The list must contain the name and registration information of every legally registered voter in the state, assign each registrant a unique identifier, and serve as the "official voter registration list for the conduct of all elections for federal office in the State." *Id.* § 21083(a)(1)(A). The list is implemented by the state, defined by the state, maintained by the state, and administered at the state level.

69. The NVRA and HAVA do not allocate "any responsibility" for administering federal elections "to the President or to any other individual in the Executive Branch with the power to act unilaterally." *See LULAC*, 808 F. Supp. 3d at 73.

70. Exercising their constitutional authority, States have long enacted laws concerning every aspect of the administration of their elections including—voter eligibility; registration; the time, place, and manner of casting and receiving ballots, including mail-in and absentee ballots; the tabulation of ballots; and the certification of results.

71. The President's unlawful Order represents an extraordinary intrusion on these congressional and State policy choices—choices the Constitution firmly assigns to those actors, not the Executive Branch.

**C.    Congress Established a Comprehensive Statutory Framework Governing the Postal Service Independent of Presidential Control**

72. The Postal Clause, art. I, § 8, cl. 7, of the U.S. Constitution provides that "Congress shall have Power . . . To establish Post Offices and post Roads." U.S. Const. art. I, § 8, cl. 7.

73. Until 1970, the Postmaster General was a member of the President's Cabinet. But pursuant to its constitutional authority, Congress passed the Postal Reorganization Act of 1970, which dismantled the cabinet-level Post Office Department and reconstituted the

postal system as the modern Postal Service. *See* 39 U.S.C. § 101 *et seq.* From the outset, Congress structured the Postal Service as an "*independent* establishment of the executive branch of the government of the United States." *See* 39 U.S.C. § 201 (emphasis added).

74.    Congress reinforced that independence by creating both an internal Board of Governors to oversee Postal Service operations and an external Postal Rate Commission to review proposed rates and classifications, thereby creating "an invaluable buffer between the management of the Postal Service and the possible influence of partisan politics." H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 3660 (1970); *see also Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 414-15 (D.C. Cir. 1993). These institutional features reflected Congress's intent to take the Post Office "completely [out of the] President's Cabinet and out of politics" and to "recast[] it in the form of an independent establishment within the executive branch of the government." H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 3654 (1970). On this point, Congress was unequivocal: "If the American public is to have the postal service that it expects and deserves, the Post Office must be taken out of politics and politics out of the Post Office." *Id.*

75.    Congress reaffirmed and strengthened its commitment to an independent Postal Service in the Postal Accountability and Enhancement Act of 2006 (PAEA), which renamed the Postal Rate Commission as the Postal Regulatory Commission (PRC) and expanded its authority from an advisory body into a regulator with binding oversight over rates, classifications, and compliance. *See* Postal Accountability and Enhancement Act, Pub. L. No. 109-435, 120 Stat. 3198 (2006); *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 890 F.3d 1053, 1055 (D.C. Cir. 2018). Through the PAEA, Congress preserved the Postal Service's operational independence while strengthening external regulatory review,

further entrenching a statutory design that isolates management from political direction and regulatory oversight from direct presidential control.

76.   Today, the Board of Governors and the PRC continue to operate pursuant to Congress's structural-independence framework. The Board directs, "[t]he exercise of the power of the Postal Service." 39 U.S.C. § 202(a)(1). It consists of nine Governors appointed by the President, by and with the advice and consent of the Senate, and serve staggered, seven-year terms together with the Postmaster General and Deputy Postmaster General. *Id.* §§ 202(a)–(d). Congress designed the Board to be bipartisan: no more than five Governors may be members of the same political party and the Governors are removable by the President only for cause. *Id.* § 202(a). The PRC is similarly composed of five Commissioners appointed by the President, by and with the advice and consent of the Senate, for six-year terms. *Id.* § 502(a), (f). Congress also created the PRC as a bipartisan body—no more than three of the Commissioners may be members of the same political party, and Commissioners likewise may be removed by the President only for cause. *See* 39 U.S.C. § 502(a), (f).

77.   Congress requires the Postal Service to "develop and promote adequate and efficient postal services." 39 U.S.C. § 3661(a). When proposed changes to these services will "generally affect service on a nationwide or substantially nationwide basis," The Postal Service must itself formulate a proposal and submit it to the PRC, which is required to conduct a public, on-the-record hearing and issue an advisory opinion before such changes may be implemented. *Id.* § 3661(b)-(c). Although the Postal Service is generally exempt from the Administrative Procedure Act ("APA"), *see* 39 U.S.C. § 410(a), the PRC is not. Congress incorporated the APA's formal adjudication procedures into the

PRC's review of such proposals by requiring hearings "on the record" pursuant to 5 U.S.C. §§ 556-557. 39 U.S.C. § 3661(c). This process assigns primary responsibility for policy development to the Postal Service, subject to independent review by the PRC.

78. In turn, the PRC exercises its own independent regulatory authority through rulemakings and adjudications governing rates, classifications, and compliance. *See* 39 U.S.C. §§ 503, 3662-3663. When performing these functions, the PRC is expressly subject to the APA, including its notice-and-comment rulemaking requirements. *See* 39 U.S.C. § 503; 5 U.S.C. § 553. Accordingly, any regulatory action by the PRC must proceed through these statutorily prescribed procedures and reflect the Commission's independent judgment, rather than the direction of the President or any other branch.

79. In sum, Congress established two distinct and independent processes for the development and regulation of postal policy: policy changes must originate with the Postal Service and, where applicable, proceed through the PRC's advisory review under § 3661, while the PRC's own regulatory actions must be undertaken through APA-governed rulemaking and adjudication.

80. Yet in his second term, President Trump has indicated an intent to encroach on the Postal Service's independence through executive action. For example, on February 21, 2025 following the swearing-in of Commerce Secretary Lutnick, President Trump announced "a form of a merger" of the Postal Service with the Department of Commerce.[1] Nothing in the PRA or PAEA authorizes the President to change the structure or coordination of the Postal Service through the Department of Commerce, nor can the President direct the

---

[1] Nandita Bose & David Shepardson, *Trump says he is considering merging U.S. Postal Service with Commerce Department*, Reuters (Feb. 21, 2025 5:53 PM), https://www.reuters.com/world/us/trump-says-he-is-considering-merging-us-postal-service-with-commerce-department-2025-02-21/.

outcome of mail processes or substitute his judgment for that of the Postal Service or the PRC.

81.    No statute authorizes the President to direct the outcome of mail processes or to substitute his judgment for that of the Postal Service or the PRC.

**II.    MILLIONS OF VOTERS RELY ON USPS EVERY FEDERAL ELECTION CYCLE TO CAST THEIR BALLOTS.**

82.    Every state provides voters with the ability to cast ballots via a unique mail-in voting process. Whether voters must qualify for a ballot by mail, can request a mail-in ballot without qualification, or will receive a mail-in ballot automatically varies by state. The deadlines for when voters must register to vote, request a mail-in ballot, and return a mail-in ballot also varies by state. All states allow qualifying voters to request mail-in ballots within 60 days of a federal election, with many states authorizing requests to be received within one to two weeks before Election Day.

83.    Because of these state mail-in balloting opportunities, millions of voters use the mail-in voting process each federal election cycle. According to the USPS, a significant portion of mailed ballots are transported after the 60-day deadline contemplated by the Executive Order's mail-in ballot and absentee voter list. For example, at least 99.22 million ballots were received and delivered by the USPS for the 2024 General Election between September 1, 2024, and November 15, 2024.[2] In the full election year, 222.39 million pieces of ballot mail were processed.[3] The sixtieth day before the 2024 election was

---

[2] U.S. POSTAL SERVICE, 2024 POST-ELECTION ANALYSIS 1 (2024), https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

[3] *Id.* at 3.

September 6,2024, so nearly three-quarters of all mailed ballots in 2024 were delivered within 60 days of Election Day.

84. Many voters register to vote and request, receive, and send their mail-in ballots within 60 days of Election Day because, every month, hundreds of thousands of people move within the United States, become eligible to vote, or must update their mailing address for a variety of reasons.[4]

85. Compared to the number of in-person voters, mail-in voters are not an anomaly. One report gathering data from the EAC's 2024 Election Administration and Voting Survey reveals that nearly one in three voters cast a ballot by mail in the last federal election.[5]

86. That same report indicates that racial minorities heavily rely on mail-in voting. Roughly 18 percent of African American voters, one-third of Hispanic voters, and half of Asian American voters cast ballots by mail in the 2024 election.[6]

87. Despite frequent use of the mail-in voting process, racial minorities experience a disproportionate amount of systemic mail-in ballot barriers and ballot rejections compared to White voters. In recent elections, like the 2018 North Carolina general Election, Black voters were twice as likely as White voters to have their mail-in ballots

---

[4] *See* Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://www.census.gov/library/stories/2023/11/state-to-state-migration.html.

[5] *Nearly 1 in 3 Americans Voter by Mail in 2024*, States United Democracy Center (Sept 4, 2025), https://statesunited.org/resources/americans-vote-by-mail-2024/#section-1.

[6] *Id.*

rejected.[7] Similar results were observed in the state of Washington, where Black voters' rejection rates were about 50 percent higher than White voters'.[8]

88.  Perceptions of the mail-in voting system also reflect severe distrust by Black voters in USPS's ability to timely deliver mail. For instance, 32 percent of Black California voters and 29 percent of Hispanic voters said that they did not trust USPS to safely and timely deliver their ballots in the 2016 General Election, compared to 21 percent of White voters.[9] Large-scale policies that introduce opportunities for more delay exacerbate the distrust many racial minority voters have in USPS delivery services, even if they still must rely on those services to vote. The Order reaches far beyond the perception that ballots might not be delivered timely by mandating that the Postal Service ignore a state's judgment and intentionally refuse to deliver some ballots regardless of whether they could have been delivered timely.

## III.  THE PRESIDENT UNLAWFULLY ATTEMPTS TO REGULATE FEDERAL ELECTIONS VIA EXECUTIVE ORDER.

### A.  President Trump Telegraphs His Plan to Unilaterally Regulate Elections Absent Congressional Action

89.  Insofar as there is an administrative record for the Executive Order, it consists of President Trump's own statements. President Trump has long trumpeted his intent to

---

[7] Sophie Chou & Tyler Dukes, *In North Carolina, Black Voters' Mail-In Ballots Much More Likely to Be Rejected Than Those From Any Other Race*, ProPublica (Sept. 23, 2020 2:30 PM), https://www.propublica.org/article/in-north-carolina-black-voters-mail-in-ballots-much-more-likely-to-be-rejected-than-those-from-any-other-race.

[8] Allard et al., *Understanding Patterns and Trends in Rejected Mailed Ballots in Washington State* 23 (2023), https://waelectiondata.csde.washington.edu/waelectiondata/files/rejected_ballots_project_report.pdf.

[9] "The California Voter Experience Study: A Statewide Survey on Voter Perspectives on Vote-By-Mail and Vote Centers," California Civic Engagement Project 2 (Sept. 3, 2017), https://static1.squarespace.com/static/.../UCDavisCCEPIssueBrief3VoteCenterStatewideSurveyBrief.pdf.

leverage executive power to unilaterally alter state voting practices with respect to mail-in voting, beginning in his first term in office and escalating in his second. The President's own statements make clear that the Executive Order is an effort to unilaterally legislate in the arena of election administration by executive fiat based on his long-standing and unsubstantiated view that mail-in voting begets voter fraud, especially after Congress's rejection of his preferred policies. The Order is predicated on the false premise that voting by noncitizens is more than an infinitesimal problem in this country.

90.    President Trump's pronouncements in this area predate the 2020 Presidential Election when he issued a series of Twitter statements expressing his claim, without basis or evidence, that mail-in voting is fraudulent:[10]



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> Follow
>
> There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent. Mail boxes will be robbed, ballots will be forged & even illegally printed out & fraudulently signed. The Governor of California is sending Ballots to millions of people, anyone.....
>
> 5:17 AM · May 26, 2020

91.    He cast doubt on the integrity of mail ballot systems in social media posts throughout the days leading up to the election being called for Joe Biden on November 7, 2020.[11]

---

[10] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 5:17 a.m.), https://x.com/realDonaldTrump/status/1265255835124539392, archived at https://perma.cc/9L7U-WDNH; *see also id.*, Twitter (July 30, 2020, 5:46 a.m.), https://x.com/realDonaldTrump/status/1288818160389558273, archived at https://perma.cc/B3SR-YSEK (claiming that "Universal Mail-In Voting" in 2020 … "will be the most INACCURATE & FRAUDULENT Election in history").

[11] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 5, 2020, 8:22 a.m.), https://x.com/realDonaldTrump/status/1324386685858287616, archived at https://perma.cc/46SX-LRWC; *see also id.* (Nov. 5, 2020, 7:09 a.m.),



92.     President Trump has continued attacking the propriety of mail-in voting in his second term. As the 2026 midterm election cycle has gotten underway, he explicitly signaled that he would assert executive power to secure his policy objectives where Congress had declined to act.

93.     On August 18, 2025, President Trump floated his first legal theory for regulating state mail ballots by executive order. He posted that he would "lead a movement to get rid of MAIL-IN BALLOTS," emphasized that "[s]tates are merely an 'agent' for the Federal Government in counting and tabulating the votes," and signaled that he planned to "sign[] an EXECUTIVE ORDER" to "bring HONESTY to the 2026 Midterm Elections."[12]

https://x.com/realDonaldTrump/status/1324368202139357186, archived at https://perma.cc/WA4X-F6M7 (claiming that "ANY VOTE THAT CAME IN AFTER ELECTION DAY WILL NOT BE COUNTED!"); *id*. (Nov. 5, 2020, 9:21 a.m.), https://x.com/realDonaldTrump/status/1324401527663058944, archived at https://perma.cc/4NZ2-Q274 (exclaiming "STOP THE FRAUD!").

[12] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, 4:17 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254, archived at https://perma.cc/BH5D-KLAQ.



> **Donald J. Trump** ✓ ⬛
> @realDonaldTrump
>
> I am going to lead a movement to get rid of MAIL-IN BALLOTS, and also, while we're at it, Highly "Inaccurate," Very Expensive, and Seriously Controversial VOTING MACHINES, which cost Ten Times more than accurate and sophisticated Watermark Paper, which is faster, and leaves NO DOUBT, at the end of the evening, as to who WON, and who LOST, the Election. We are now the only Country in the World that uses Mail-In Voting. All others gave it up because of the MASSIVE VOTER FRAUD ENCOUNTERED. WE WILL BEGIN THIS EFFORT, WHICH WILL BE STRONGLY OPPOSED BY THE DEMOCRATS BECAUSE THEY CHEAT AT LEVELS NEVER SEEN BEFORE, by signing an EXECUTIVE ORDER to help bring HONESTY to the 2026 Midterm Elections. Remember, the States are merely an "agent" for the Federal Government in counting and tabulating the votes. They must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do. With their HORRIBLE Radical Left policies, like Open Borders, Men Playing in Women's Sports, Transgender and "WOKE" for everyone, and so much more, Democrats are virtually Unelectable without using this completely disproven Mail-In SCAM. ELECTIONS CAN NEVER BE HONEST WITH MAIL IN BALLOTS/VOTING, and everybody, IN PARTICULAR THE DEMOCRATS, KNOWS THIS. I, AND THE REPUBLICAN PARTY, WILL FIGHT LIKE HELL TO BRING HONESTY AND INTEGRITY BACK TO OUR ELECTIONS. THE MAIL-IN BALLOT HOAX, USING VOTING MACHINES THAT ARE A COMPLETE AND TOTAL DISASTER, MUST END, NOW!!! REMEMBER, WITHOUT FAIR AND HONEST ELECTIONS, AND STRONG AND POWERFUL BORDERS, YOU DON'T HAVE EVEN A SEMBLANCE OF A COUNTRY. THANK YOU FOR YOUR ATTENTION TO THIS MATTER!!! DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES OF AMERICA
>
> **19.3k** ReTruths   **68.6k** Likes                          Aug 18, 2025, 4:17 AM

94. The President reiterated this plan later that day, announcing that, "We're going to start with an executive order that's being written right now by the best lawyers in the country to end mail-in ballots because they're corrupt."[13]

95. He kept up the drumbeat on Truth Social in the weeks that followed, confirming that he would be issuing an executive order to restrict mail-in voting.[14]

---

[13] *See* Donald J. Trump, *Remarks to the Press During Oval Office Meeting with Ukrainian President Volodymyr Zelenskyy*, C-SPAN, https://www.c-span.org/clip/washington-journal/plan-to-eliminate-mail-in-ballots-and-voting-machines/5170135, (Aug. 18, 2025) (video at 1:21-1:32).

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2025, 6:49 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115120863399877029, archived at https://perma.cc/35R2-B3PR.



96.    Just before his 2026 the State of the Union address, President Trump again made clear

that he would act to regulate mail-in voting—"whether approved by Congress or not."[15]



97.    In his February 24, 2026 State of the Union address, President Trump highlighted his

policy views on mail-in voting, characterizing it as "crooked," while offering no evidence

---

[15] Donald J. Trump (@realDonaldTrump), Truth Social, (Feb. 13, 2026, 1:35 p.m.), https://truthsocial.com/@realDonaldTrump/posts/116065471857020644, archived at https://perma.cc/C6BE-HQRB.

to support this claim, and calling on Congress to address it and other aspects of the electoral process through the SAVE America Act.[16]

98.    On March 8, 2026, the President announced that he would "not sign other Bills until" the SAVE Act was passed, and called on Congress to "GO FOR THE GOLD" by passing a version of the bill that contained restrictions like mail-in voting prohibitions, "NOT THE WATERED DOWN VERSION."[17]



Donald J. Trump ✔ ⬛
@realDonaldTrump

Great Job by hard working Scott Pressler on Fox & Friends talking about using the Filibuster, or Talking Filibuster, in order to pass THE SAVE AMERICA ACT, an 88% issue with ALL VOTERS. It must be done immediately. It supersedes everything else. MUST GO TO THE FRONT OF THE LINE. I, as President, will not sign other Bills until this is passed, AND NOT THE WATERED DOWN VERSION - GO FOR THE GOLD: MUST SHOW VOTER I.D. & PROOF OF CITIZENSHIP: NO MAIL-IN BALLOTS EXCEPT FOR MILITARY - ILLNESS, DISABILITY, TRAVEL: NO MEN IN WOMEN'S SPORTS: NO TRANSGENDER MUTILIZATION FOR CHILDREN! DO NOT FAIL!!! President DONALD J. TRUMP

13.5k ReTruths    49.7k Likes                Mar 08, 2026, 8:22 AM

99.    The President repeated this sentiment in a March 12, 2026 statement, "urgently calling on Congress to pass the SAVE America Act immediately and safeguard America's elections

---

[16] Associated Press, *Read the Complete Transcript of Trump's 2026 State of the Union*, AP News (Feb. 25, 2026), archived at https://perma.cc/DH4P-TKEC.

[17] Donald J. Trump (@realDonaldTrump), Truth Social (March 8, 2026, 5:22 a.m.), https://truthsocial.com/@realDonaldTrump/posts/116193527873859174, archived at https://perma.cc/6VC2-8W7G.

from illegal voting."[18] The release repeated the President's claim, with no substantiating evidence, that "Voting by mail increases the risk of fraud."

100. The Senate has nonetheless repeatedly rejected the SAVE Act. The body declined to invoke cloture on amendments to the bill on March 21, 2026 and March 26, 2026.[19]

101. The President issued this Executive Order on March 31, 2026, just days after the Senate's latest failure to advance the SAVE Act. The timing of the Executive Order is also convenient for its data-sharing provisions. The Order lumps in interagency and third-party data-sharing provisions after courts reject the Executive Branch's efforts to amass national databases of voter rolls. *Weber*, No. 2:25-cv-09149, 2026 WL 118807 at *17-19; *Benson*, No. 1:25-cv-1148, 2026 WL 362789 at *11; *Oregon*, No. 6:25-cv-01666 2026 WL 318402 at *11.

102. The claims of fraud in the Executive Order and the President's wholesale restrictions on well-established state voting practices are not based on any specific findings of fact by the Trump administration nor on any recent developments warranting executive action, but are instead solely based on his unsubstantiated and counterfactual grievances with the 2020 election results, where President Trump alleges widespread fraud.[20]

---

[18] The SAVE America Act Is the Most Popular Election Reform in Decades, The White House (March 12, 2026).

[19] U.S. Senate Daily Press, Saturday, March 21, 2026, https://www.dailypress.senate.gov/saturday-march-21-2026/; U.S. Senate Daily Press, Thursday, March 26, 2026, https://www.dailypress.senate.gov/thursday-march-26-2026/.

[20] President Trump's election grievances alleged widespread fraud in the voting process. *See e.g.,* @realDonaldTrump, X (November 4, 2020 7:04 a.m.), https://perma.cc/Y6PS-Z4V3 (claiming that his electoral lead "magically disappear[ed]" as "surprise ballot dumps were counted"); *Id.* (November 5, 2020, 8:22 a.m.), https://perma.cc/F4Z8-YLQY (claiming that he will challenge all Biden-won states for voter fraud and state election fraud).

103. The President's claims of fraud have been uniformly rejected on both factual and legal grounds by federal courts across the nation. *See e.g. Bowyer v. Ducey*, 506 F. Supp. 3d 699, 706 (D. Ariz. 2020) (dismissing plaintiff's action seeking to set aside the results of the 2020 election due to claims that the electoral process was "so riddled with fraud, illegality, and statistical impossibility" in part because the "complaint's allegations were "sorely wanting of relevant or reliable evidence"); *see also Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa.), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377 (3d Cir. 2020) (dismissing Plaintiffs' action seeking in relevant part to challenge Pennsylvania's notice and cure procedure for defective mail-in ballots with prejudice due to "strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence" which "cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state."). Those claims do not provide any appropriate or valid basis to overhaul privacy protections, the state administration of list maintenance, or state mail ballot systems.

**B.      The Executive Order Makes Sweeping and Unlawful Changes to Federal and State Election Laws and Practices**

104. The Order makes numerous unlawful changes to current voting practices in violation of the U.S. Constitution and federal statutes.

105. Section 2(a) of the Order requires the Secretary of DHS, acting through the Director of the USCIS and in coordination with the Commissioner of the SSA, to compile a list of all U.S. citizens who will be at least 18 by the date of the next federal election for each state. *See* Exec. Order § 2(a). The lists are to be generated using data from several federal agencies, including the SSA, DHS's Systematic Alien Verification for Entitlements

program, and other federal databases. *See id*. Given the sources of the underlying data, these lists are likely to contain significant inaccuracies and will result in infringements upon statutorily and constitutionally protected rights.

106. Despite a weak reference to the Privacy Act of 1974, Section 2(a) does not provide any mechanism to satisfy statutory privacy safeguards. Any assurances within the Order that Defendants will not violate the Privacy Act fall flat. The federal government has repeatedly mishandled private information. Two courts dismissed as pretextual the DOJ's explanation of what it intends to do with unredacted voter rolls it has demanded from virtually every state. *See Weber*, No. 2:25-cv-09149, 2026 WL 118807 at *17-19; *Oregon*, No. 6:25-cv-01666 2026 WL 318402 at *11.

107. The Order also directs the Secretary of DHS to disseminate the State Citizenship List to the chief election officer in each state "no fewer than 60 days before each regularly scheduled Federal election." Exec. Order § 4(c). To the extent that this list will be used for voter registration and list maintenance purposes, especially absent the request of states, the President lacks authority to dictate the administration of voter lists at the state and local levels.

108. Section 2(b) of the Order instructs the Attorney General to prioritize investigations and prosecutions of state and local officials, as well as others, alleged to have provided mail-in ballots to individuals that the Administration has deemed ineligible. *See* Exec. Order § 2(b). The Order then instructs the Attorney General to prioritize the investigations and prosecutions of individuals and entities that are "engaged in, or aiding and abetting, the printing, production, shipment, or distribution of ballots to individuals who are not

eligible to vote," despite many individuals and organizations engaging in the protected activities to widely encourage others to participate in elections.

109. The provisions of Section 3 of the Order would have the USPS, which is not under the control of the President, determine nationwide who can vote by mail and interfere with states' management and lawful transmission of mail-in or absentee ballots.

110. Section 3 of the Order directs the Postmaster General to initiate a proposed rulemaking within 60 days to establish new requirements for mail-in and absentee ballots. Pursuant to Section 3(i), the USPS rules must include provisions requiring that all outbound ballot mail must be in envelopes that are marked as Official Election Mail and include a unique Intelligent Mail barcode for tracking.

111. Section 3(b)(iv) directs the USPS to generate a "Mail-In and Absentee Participation List" for each state, identifying individuals who are "enrolled with the USPS" to vote by mail or absentee ballot. Further, Section 3(b)(iii) of the Order prohibits the USPS from delivering any mail-in or absentee ballots for individuals not included on the "Mail-In and Absentee Participation List." That is, even if a voter is fully eligible and registered under state law, unless the voter also appears on the internal Mail-In and Absentee Participation List generated by the USPS, the Order mandates that USPS refuse to deliver a completed ballot. In effect, the Order blocks the delivery of valid mail-in or absentee ballots.

112. Section 4(a) requires the Secretary of DHS, the Commissioner of the SSA, and the Postmaster General to coordinate  implementation of the Order with the Secretary of Commerce.

-37-

C.      **The Executive Order Relies on Unlawful Enforcement Mechanisms Beyond the President's Authority**

113.    The President has no authority to impose these sweeping and unlawful changes to federal and state election practices.

114.    First, provisions in the Order that require states to alter their election administration policies and procedures, including their voter registration and mail-in and absentee voting procedures, exceed the President's authority because the Constitution assigns regulation of election procedures to the States and Congress, not the Executive. *ITCA*, 570 U.S. at 8-9; U.S. Const. Art. I, 4, cl. 1; *LULAC*, 808 F. Supp. 3d at 45 ("The States have initial authority to regulate elections. Congress has supervisory authority over those regulations. The President does not feature at all."); *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.").

115.    Second, the Order includes several provisions directing the USPS and Postmaster General to interfere with the transmission of mail-in and absentee ballots. The President has no constitutional or statutory authority to compel the USPS or the Postmaster General to initiate rulemaking, or to dictate USPS policy. The USPS is "an independent establishment of the executive branch," removed from the President's Cabinet and governed by a Board of Governors. 39 U.S.C. §§ 201, 202; 39 C.F.R. § 221.5(a)(3).

116.    Third, the Order's directive that the Secretary of the SSA provide citizenship and "identity data" to DHS for the compilation and transmission of citizenship and personally identifying information also violates federal law. The Privacy Act prohibits the use of federal records, including records indicating citizenship and personally identifying information, without specific authorization. *See* 5 U.S.C. § 552a. The President does not

have the authority to mandate the SSA to share personally identifying information with DHS and cannot circumvent congressional safeguards within the Privacy Act to compile and transmit citizen information.

117.    Fourth, the Order directs the Attorney General and the heads of executive departments and agencies to withhold federal funds from "noncompliant States and localities." Federal funding requirements are determined by statute—the President has no authority to unilaterally change statutory funding conditions.

118.    Finally, the Order demands states and localities to preserve all records and materials of voter participation in a federal election for a five-year period, beyond the congressionally mandated election record retention requirement of 22 months under 52 U.S. § 20701 and two years under 52 U.S.C. § 20507(i)(1). The President has no authority to unilaterally change statutory record retention requirements.

### D.    The Executive Order Relies on Inaccurate and Flawed Databases

119.    As discussed, Section 2 of the Order requires the Director of the USCIS and the Commissioner of the SSA to "compile and transmit to the chief election officer of each state a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State. (State Citizenship List)." Section 4 also requires this collaboration across agencies for interagency data sharing.

120.    Section 2 of the Order further states that "The State Citizenship List shall be derived from Federal Citizen and naturalization records, SSA records, SAVE data, and other relevant federal databases."

121. In addition to the federal privacy encroachments involved in creating the State Citizenship List, the databases that the Order purports to rely upon are flawed, prone to error, and not reliable for the purpose of verifying citizenship.

### 1. The SAVE System is an Inaccurate and Flawed Database

122. The SAVE system was created in 1986 to allow government agencies to verify whether noncitizens are eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, §§ 121(a)(1)(C) & 121(c)(1).

123. The original SAVE system was not designed or intended to identify U.S. citizens.[21]

124. SAVE searches required DHS-assigned immigration numbers and only accessed immigration-related records.[22] SAVE searches could only be conducted for one individual at a time.

125. The SAVE system was documented to have significant error rates. For example, the North Carolina State Board of Elections found in a 2016 audit that "a match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE."[23] The North Carolina State Board of Elections further found "that 97.6% of persons identified by the [State Department of Motor Vehicles] as noncitizens, in fact were citizens, and that about 75% of individuals who later provided proof of

---

[21] *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, DHS Ref. N. DHS/USCIS/PIA-006(c),* DEPT. OF HOMELAND SEC., 2-3 (June 30, 2020), https://perma.cc/HU2M-NTL8 ("2020 SAVE PIA").

[22] *Id.* at 2.

[23] *Post Election Aduit Report: General Election 2016,* N.C. STATE BD. OF ELECTIONS (Apr. 21 2017), https://perma.cc/WH8U-RZ4B.

citizenship continued to be listed as noncitizens in the SAVE system." *Pub. Int. Legal Found., Inc. v. N.C. State Bd. Of Elections,* 996 F.3d 257, 261 (4th Cir. 2021).

126.    Executive Order 14248 recently expanded the use of the SAVE system to allow queries to the SAVE system using Social Security numbers and allowing queries of more than one case at a time.

127.    This data-matching between SAVE and DHS is prone to errors, as has been acknowledged by DHS officials.[24] Brian Broderick, who leads the verification division of USCIS, stated that SAVE is a tool to provide to users that may or may not work. "So we're giving a tool to these folks to say, 'Hey, if we can verify citizenship, great, you're good. If we can't, now it's up to you to determine whether to let this person on your voter rolls.'"[25]

128.    A recent review found that the SAVE database had numerous significant inaccuracies in numerous Missouri counties.[26]

129.    Even the DOJ represented to the U.S. District Court of Rhode Island that the SAVE system, despite recent changes, is still prone to errors for failing to include U.S. citizens in its list. Transcript of Motion to Compel and Motion to Dismiss Hearing at 52, *United States v. Amore*, No. 25-cv-639 (D. R.I. March 26, 2026), ECF No. 47. Eric Neff, the Acting Chief of the Voting Section within the Civil Rights Division of the DOJ described the DHS's SAVE citizenship verification process as having "holes in the process,"

---

[24] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes,* PROPUBLICA (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

[25] *Id.*

[26] *See* Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas,* THE TEX. TRIB. (Feb 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

specifically for derived citizens whose parents naturalize when they are minors and who automatically become U.S. citizens without any additional documentation to prove citizenship. *Id.* 8 U.S.C. § 1431.

### 2. The SSA Database is Not Reliable for Establishing State Citizenship Lists

130. The SSA database is not suitable for confirming U.S. citizenship for multiple reasons.

131. First, SSA citizenship data captures a citizen's status at the specific moment in time when an individual applies for a Social Security Number (SSN). If that application occurs prior to naturalization, which is typical, the SSA does not automatically update the individual's citizenship status after naturalization. As the SSA has recently asserted, "there is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments."[27]

132. SSA has itself stated that "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA" and "SSA's records do not provide definitive information about an individual's citizenship status."[28]

133. SSA has explained that "SSA is not the agency responsible for making citizenship determinations and SSA is not the custodian of U.S. citizenship records."[29]

134. A 2006 audit by SSA's Office of Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as noncitizens "because

---

[27] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[28] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[29] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

the individuals had become U.S. citizens after obtaining their SSN but had not updated their records with SSA."[30]

135.    Second, SSA lacks complete citizenship data for citizens born in the United States prior to 1981. SSA has stated that "SSA did not begin to consistently maintain citizenship information until 1981 … Accordingly, SSA does not have citizenship information for all individuals who have been issued an SSN."[31]

136.    Third, SSA citizenship data typically does not accurately identify derived citizens, which are citizens born outside of the United States and derive citizenship as children when their parents naturalize. These individuals have no reason to interact with the SSA until they apply for Social Security benefits, so their SSA records would not accurately identify their status as derived citizens.

137.    According to one assessment cited by SSA, "approximately 1/4" of SSA's records "do not have an indication of citizenship present."[32]

138.    Therefore, the "State Citizenship List" contemplated by the Executive Order would be constructed from databases that are concededly incomplete, outdated, and prone to significant error, including the systematic misidentification of U.S. citizens as noncitizens and the failure to capture large categories of citizens altogether. By directing federal agencies and States to rely on these flawed data sources to determine voter eligibility and the transmission of election-related mail, the Executive Order rests on unreliable and

---

[30] SSA Off. Of the Inspector Gen., Cong. Resp. Rep. No. A-08-0626100, *Accuracy of the Social Security Administration's Numident File* (Dec. 18, 2006), https://perma.cc/5G2J-FF4V.

[31] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[32] Letter from SSA Off. Of Gen . Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

inaccurate information that is incapable of supporting the determinations it purports to mandate. The Order's reliance on these defective databases will foreseeably result in the erroneous exclusion or disenfranchisement of eligible voters, thereby causing concrete and particularized injury to Plaintiffs and their members.

**IV.    THE EXECUTIVE ORDER CAUSES IRREPARABLE AND SUBSTANTIAL HARM TO PLAINTIFFS AND THEIR MEMBERS.**

139.    The Executive Order threatens immediate, concrete, and irreparable harm to Plaintiffs and their core missions. For NAACP and Common Cause, it also threatens such harm to their individual members by unduly burdening their right to vote. The Order's provisions may lead to the purging of eligible voters from the voter rolls and that will make it harder to vote with mailed ballots will directly impair Plaintiffs' core activities of educating members and the public about the steps needed to register to vote and ensuring that they can cast effective ballots. The Order provides for a labyrinthine process that makes it difficult for voters to determine their status, obscures how voters can appeal or correct their exclusion for list of citizens, and mandates timelines that are extremely challenging to obtain any relief. Educating, preparing, and assisting voters in dealing with an entirely new and abstruse genre of complications to voter registration and vote by mail will interfere with Plaintiffs' missions and cause them to divert resources in ways that will cause them irreparable harm.

140.    Many NAACP and Common Cause members vote by mail and plan to use USPS services to cast their ballots in upcoming federal elections. Amongst NAACP and Common Cause's membership are eligible voters who submit voter registration forms and absentee ballot request forms close to election deadlines mandated by state law. These members include elderly, disabled, college, rural, incarcerated, and traveling voters who rely on

USPS to vote. These state-imposed election deadlines are much closer in time to Election Day than the 60 days that the Order requires for the creation of its USPS mailed ballot list. *See* Exec. Order § 3. These members' ability to vote would be impaired by the Order's mandate that USPS may "not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." Exec. Order § 3(C)(ii).

141. The Order will impose substantial burdens on Plaintiffs NAACP, BVM, and Common Cause by forcing a diversion of limited resources away from their planned activities in a federal election year and beyond. The new burdens imposed by the Order will require Plaintiffs, in addition to the current work they do to fulfill their mandate on educating and assisting voters to exercise the franchise, to revise and update educational and outreach materials, respond to increased inquiries and concerns from members, and conduct additional training for staff and volunteers to address the resulting confusion and compliance issues related to the voter lists. Continuing to fulfill their longstanding mission will require Plaintiffs to undertake significant additional work. These unplanned demands will consume time, labor, and financial resources, disrupt preexisting programmatic goals, and substantially impair the organizations' ability to carry out their intended activities.

142. Plaintiffs NAACP, BVM, and Common Cause will also need to expand volunteer recruitment and retention efforts to educate volunteers concerned about potential federal investigations and prosecutions for assisting with voter registration and mail-in voting. The Order's threats of investigation and prosecution against individuals and entities that "aid and abet" voting by an ineligible person is sufficiently vague that they create

concerns about potential attacks by the administration on the voter education and support that these organizations provide. These fears of retaliation are not speculative. For example, the Texas Attorney General in 2024 issued investigative demand requests to an organization performing voter registration services in primarily young Latino communities. *See Jolt Initiative, Inc. v. Paxton*, No. 1:25-cv-1808-RP, 2026 WL 297633, at *1 (W.D. Tex. Jan. 29, 2026). While a district court recently enjoined the enforcement of the demand because it amounted to voter intimidation, *see id.* at *12, the state Attorney General first pursued the request under empty allegations that the organization's volunteers were helping individuals who were not citizens register to vote. *Id.* *2-3. Plaintiffs must dedicate additional time and resources to combat this fear of retaliation. Similarly, the members of NAACP and Common Cause will be directly and adversely impacted by the Order. Members both encourage and provide guidance on mail-in voting and rely on USPS to cast their ballots. The Order has already created confusion, uncertainty, and fear regarding the rights and obligations of their members. Given this, members will experience reduced access to accurate information, timely assistance, and support from the organizations. Further, the heightened risk of legal scrutiny and prosecution may chill lawful participation and discourage members from exercising protected rights.

143. Moreover, on information and belief, the memberships of NAACP and Common Cause include citizens who are naturalized or derived who may not be accurately identified in the SAVE system. Plaintiff organizations also include members who may lack citizenship information on their records in the SSA data system. Accordingly, use of these systems to compile State Citizenship Lists, as required by Sections 2 and 4 of the Order, will harm

Plaintiffs' members by causing them to undertake numerous timely and costly steps to prove that they are eligible to vote, which will cause Plaintiff organizations to divert resources to educate members regarding how to ensure they are eligible to vote notwithstanding erroneous information on State Citizenship Lists.

144. As entities that assist voters with registering to vote and addressing the mechanics of voting, including voting by mail or absentee voting, NAACP, BVM, and Common Cause read the enforcement provisions as a chilling threat of significant adverse consequences if the organization helps a voter obtain a ballot and DHS or USPS later deems that voter ineligible based on flawed data. *See* E,O, § 2(b);§ 5.

## CLAIMS FOR RELIEF

### COUNT I:
### Ultra Vires Presidential Action
### (U.S. Const. art. I § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2)
### (All Defendants)

145. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

146. "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) (*NFIB*). Accordingly, it is "black letter law" that the President's power to issue an edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 173, 188-89 (1999) (quotation omitted); *see Youngstown*, 343 U.S. at 585. The President lacks any authority to act "unconstitutionally or beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n. 11 (1949)). And "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com.*

*of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of *ultra vires* action are reviewable), *cert. denied*, 144 S. Ct. 1110 (2024).

147. In the realm of elections, the President's constitutional and statutory authority is purposefully limited. The Constitution itself grants the President no direct authority over elections. Instead, the Constitution "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69 (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. 2, § 1, cl. 2.

148. In contrast to Congress's express authority to regulate elections, the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* (quoting *Roudebush*, 405 U.S. at 24). The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id*. at 1347. Instead, the President and other executive officers may only act "in relation to another branch's constitutionally authorized act." *Id*.

149. The Executive Order dramatically exceeds his highly limited constitutional and statutory authority when it comes to regulating elections. The Order identifies no source of legal authority—and none exists—for the President to compile and disseminate state-by-state lists of purportedly eligible voters derived from federal databases, *see* Exec. Order § 2(a), § 4(c); direct federal enforcement actions against state and local officials and private actors involved in the administration and facilitation of voting, *see id.* § 2(b); require

federal agencies to coordinate and share election-related data across—and, indeed, beyond—the executive branch, *see id.* § 4(a); and mandate that the Postal Service initiate rulemaking and impose nationwide conditions on the transmission and delivery of mail-in and absentee ballots, including by restricting delivery to voters identified on federally prescribed lists, *see id.* § 3.

150. Each of these commands is *ultra vires* because the President lacks any constitutional or statutory authority to issue them. And each command harms Plaintiffs and their members and supporters by making it more difficult to register voters, to maintain the registrations of existing voters, and to successfully cast ballots, including by mail, and to have such votes counted in fairly administered elections.

151. Specifically, the President lacks authority under the Constitution and Congress's election-related statutes—including the Elections Clause, U.S. Const. art. I, § 4, cl. 1, the Qualifications Clause, U.S. Const. art. I, § 2, cl. 1, the Electors Clause, U.S. Const. art. II, § 1, cl. 2, and statutes such as the National Voter Registration Act, the Help America Vote Act, and the Uniformed and Overseas Citizens Absentee Voting Act—to regulate voter eligibility, prescribe the manner in which ballots are cast or transmitted, compel state officials to alter their election procedures, or direct independent federal entities to impose nationwide conditions on the delivery and counting of mail ballots.

152. Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful to the extent it purports to direct *ultra vires* actions.

**COUNT II:**
**Violation of Separation of Powers — Unlawful Intrusion on Congressional Authority and**
**Violation of Federalism**
**(U.S. Const. art. I § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2)**
**(All Defendants)**

153. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

154. The Constitution authorizes private Plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The claim "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

155. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress. *Id*. at 637 (Jackson, J., concurring). The President cannot enact, amend, or repeal statutes. *Clinton v. City of New York,* 524 U.S. 417, 438 (1998). "The President must 'point to clear congressional authorization' to justify" such extraordinary assertions of authority with respect to election administration via executive order. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 641-642 (2026) (quoting *Nebraska*, 600 U.S. at 506) (rejecting Presidential power to order tariffs without congressional authorization). The constitutional separation of powers is "intended, in part, to protect each branch of government from incursion by the others." *Bond v. United States*, 564 U.S. 211, 222 (2011). The "structural principles secured by the separation of powers protect the individual as well," including by preserving constitutionally mandated "checks and balances" between the federal branches of government. *Id*. at 222-23.

156. The Executive Order intrudes upon Congress's prerogatives in several respects. Most fundamentally, the Constitution assigns to Congress and the States—not the President—the authority to regulate federal elections. *See* U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2. Congress has exercised that authority by enacting a comprehensive statutory framework governing voter registration, voter list maintenance, absentee and mail voting, and the administration of federal elections, including through the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*, and the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq*. These statutes assign primary responsibility for election administration to the States, subject to limited federal standards enacted by Congress. The Constitution assigns no comparable authority to the President. Moreover, in recently rejecting the SAVE Act, Congress has indicated an unwillingness to adopt the President's preferred election administration policies, further reducing the President's authority to regulate elections. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

157. Congress has likewise exercised its authority under the Postal Clause to establish and govern the operations of the Postal Service as an independent establishment, and to prescribe both the substantive obligations and procedural mechanisms governing its operations. *See* 39 U.S.C. §§ 101, 201, 3661. Congress has required that the Postal Service operate as a neutral, nondiscriminatory carrier of the mail, *id.* §§ 101(a), 403(c), and has specified the processes by which nationwide changes to postal services may be adopted, including through § 3661 proceedings subject to independent review by the Postal Regulatory Commission. Congress has not authorized the President to direct USPS

rulemaking, to impose substantive requirements on the handling or delivery of election mail, or to condition the transmission of mail on voter eligibility determinations.

158. The Executive Order violates the Constitution's separation of powers by purporting to exercise regulatory authority that the Constitution assigns to Congress and that Congress has exercised through statute. Among other things, the Order purports to (a) impose new nationwide conditions on the transmission and delivery of mail-in and absentee ballots, including requirements that voters be included on federally derived lists, *see* Exec. Order § 3(b); (b) mandate that the Postal Service initiate and complete rulemaking of specified substantive content on a fixed timetable determined by the President, *id.* § 3(b), (d); (c) create and disseminate federal "State Citizenship Lists" for use in connection with voter eligibility and election administration, *id.* § 2(a), § 4(c); and (d) prioritize federal investigations and enforcement actions against state and local officials and private actors engaged in election administration, *id.* § 2(b). These directives attempt to establish new federal election rules and displace the statutory framework Congress has enacted.

159. In doing so, the Executive Order usurps Congress's legislative authority and overrides the careful allocation of power that Congress has established. The President cannot "seize[] the power of the Legislature" by implementing policies that Congress has not enacted and, in many respects, has declined to enact. *See Nebraska*, 600 U.S. at 503. Nor may the President direct independent entities, including the Postal Service, to exercise their statutory authority in a manner inconsistent with Congress's design. Because the Executive Order attempts to substitute presidential directives for the statutory framework governing elections and postal operations, it violates the Constitution's separation of powers.

160. Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful and enjoined because the Order alters the rules governing federal elections, burdens the ability of Plaintiffs and their members to register voters and facilitate voting, and threatens the disenfranchisement of eligible voters through unlawful federal interference with ballot transmission and election administration.

**COUNT III:**
**Violation of Separation of Powers — Unlawful Intrusion on State Authority**
**(U.S. Const. art. I § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend X)**
**(All Defendants)**

161. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

162. The Constitution authorizes private Plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong*, 575 U.S. at 327. The claim "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

163. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The President acts at the "lowest ebb" of his power if he acts contrary to the expressed or implied will of Congress. *Id*. at 637 (Jackson, J., concurring). The President may not enact, amend, or repeal statutes. *Clinton,* 524 U.S. at 438. "The President must 'point to clear congressional authorization' to justify" such extraordinary assertions of authority with respect to election administration via executive order. *See Learning Res., Inc.,* 146 S. Ct at 641-642 (quoting *Nebraska*, 600 U.S. at 506) (rejecting Presidential power to order tariffs without congressional authorization).

164. The Constitution establishes "a vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir.

2011) (Sutton, J., concurring in part). As relevant to this case, this separation is reflected in both the Constitution's assignment to State Legislatures the power to set the "Times, Places, and Manner" of federal elections, U.S. Const. Art. I, Sec. 4, as well as the Tenth Amendment's "reserve[ation] to the States" all "powers not delegated to the United States by the Constitution."

165. The Executive Order violates the Constitution's separation of powers between the federal government and the States by requiring executive officials to take actions that intrude upon matters the Constitution leaves to the States. The Elections Clause assigns to state legislatures the authority to regulate the "Times, Places, and Manner" of federal elections, subject only to Congress's authority to alter such regulations. U.S. Const. art. I, § 4, cl. 1. The Executive Order nonetheless purports to override state election laws by imposing federal conditions on the casting and transmission of mail-in and absentee ballots, including by requiring States to conform to federally prescribed timelines, ballot-handling procedures, and voter eligibility verification mechanisms. *See* Exec. Order §§ 2(a), 3(b), 4(c).

166. In particular, the Executive Order attempts to compel or coerce States to alter their election procedures by (a) conditioning the transmission and delivery of mail-in and absentee ballots in compliance with federally imposed requirements, including the provision of voter lists and the use of specified ballot envelope formats, *see id.* § 3(b)(i)-(ii); (b) interposing federal eligibility determinations—through the "State Citizenship List" and USPS-controlled participation lists—into state voter registration and ballot distribution processes, *see id.* §§ 2(a), 3(b)(iii)-(iv); and (c) leveraging federal enforcement authority to potentially investigate or prosecute—and at the very least,

chill—state and local officials who administer elections in accordance with state law but contrary to the Executive Order's directives, *see id.* § 2(b). These provisions collectively operate to displace state authority over election administration and substitute federal executive control.

167. The Executive Branch may not require States to administer their own laws in accordance with federal directives, whether through direct commands or through indirect pressure. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471-72 (2018); *New York v. United States*, 505 U.S. 144, 166 (1992). These limits reflect the Constitution's allocation of authority between the federal government and the States, which protects individual liberty by preventing the concentration of power in a single branch or level of government. *See Bond*, 564 U.S. at 221-23. In the specific context of federal elections, that allocation places primary responsibility for regulating election procedures with the States, subject to congressional—not presidential —oversight. *See ITCA*, 570 U.S. at 8–9 (2013); *Moore*, 600 U.S. at 29. The Executive Order departs from these principles by using federal authority over the mail and federal enforcement mechanisms to pressure States to modify their election systems, a form of indirect control that the Constitution does not permit. *See NRA v. Vullo*, 602 U.S. 175, 190 (2024); *cf. LULAC v. Exec. Office of the President*, Nos. 25-0946 (CKK), 25-0952 (CKK), 25-0955 (CKK), 2026 WL 252420, at *42 (D.D.C. Jan. 30, 2026). By conditioning the transmission and delivery of ballots in compliance with federal requirements, the Order effectively compels States to conform their election practices to presidential directives, in violation of the Tenth Amendment and the Elections Clause.

168. The Executive Order, therefore, usurps the States' constitutional authority and violates the Constitution's separation of powers. Its provisions would interfere with States' established systems for voter registration, absentee and mail voting, ballot transmission, and election administration, and would impose federally dictated conditions that many States neither require nor authorize under their own laws.

169. Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful and enjoined because the Order will disrupt state election systems, create confusion among voters and election officials, burden Plaintiffs' efforts to assist voters in navigating state election laws, and result in the disenfranchisement of eligible voters whose ballots are delayed, rejected, or never transmitted due to unlawful federal interference.

**COUNT IV**
**Constitutional Right to Vote (U.S. Const., amends. I & V)**
**(All Defendants)**

170. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

171. The First and Fourteenth Amendments to the U.S. Constitution guarantee the fundamental right to vote free from excessive burdens. *Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434.

172. In evaluating election regulations, courts weigh "the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justification for the burden imposed by its rule" considering "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789.)

173. Voting restrictions that impose severe burdens on a plaintiff's right to vote "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). Even laws that impose less severe restrictions "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation omitted). The Order imposes unjustifiable burdens on the right to vote by threatening to arbitrarily disenfranchise voters whose names are omitted from a federally managed eligibility list and by imposing additional burdens on any voter who wishes to lawfully vote by mail in federal elections.

174. Section 3(b) of the Executive Order directs the Postmaster General to initiate a rulemaking that would restrict the Postal Service from delivering mail-in ballots to voters who do not appear on a federally compiled "Mail-In and Absentee Participation List." This list is, in turn, informed by a "State Citizenship List" compiled by DHS under Section 2(a) of the Order, using federal immigration and identity databases that were not designed to serve as voter eligibility registers and that are known to contain errors, omissions, and incomplete records.

175. For eligible registered voters who do not appear on the Participation List, whether because of data-entry errors, name mismatches, database gaps, or the failure of federal records to capture native-born citizens who have never interacted with the immigration system, the Order's effect is to prevent them from receiving a ballot through the mail.

176. The burden the Order imposes is not limited to the denial or delay of individual ballots. The Order's creation of a new, untested federal eligibility-verification layer will generate confusion and uncertainty among voters, including Plaintiffs and for Common Cause and

NAACP, also their members, about whether they are eligible to receive a mail ballot, whether their ballot will be delivered, and what steps they must take to ensure their vote is counted. This confusion will deter eligible voters, including Plaintiffs and for Common Cause and NAACP, also their members, from participating in the electoral process.

177.    Under the Anderson-Burdick framework, burdens of this character and magnitude are subject to strict scrutiny. Defendants cannot satisfy that standard. The stated justification for the Executive Order is the prevention of voting by noncitizens—a practice that is already illegal under federal law, 18 U.S.C. § 611, and that multiple federal and state investigations have found to be exceedingly rare. The Order does not purport to identify any instances of such violations, much less violations that the Order's directives would have prevented.

178.    Even if preventing noncitizen voting were a compelling interest sufficient to justify some regulation of the mail-voting process, the Order is not narrowly tailored to advance that interest. The Order's mechanism—conditioning ballot delivery on inclusion in a federal database compiled from records not designed for this purpose—is both overinclusive, because it will sweep in large numbers of eligible citizens, and underinclusive, because it does nothing to address noncitizen voting through in-person channels.

179.    Even under a lesser standard of scrutiny, the Order fails. The burdens the Order imposes on the right to vote are not reasonable and are not justified by the government's regulatory interests. The government has no legitimate interest in constructing a federal voter eligibility-verification system that displaces state authority over voter qualifications and interposes federal databases with known error rates between eligible registered voters and their ballots.

180.  The Executive Order violates the First and Fourteenth Amendments to the U.S.

Constitution.

### COUNT V: VIOLATION OF THE USPS'S STATUTORY AUTHORITY
### 39 U.S.C. §§ 101, 402
### (All Defendants)

181.  Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

182.  The Order is unlawful because it exceeds and intrudes upon the purpose, powers, and

processes that Congress has set for the USPS. According to its governing statute, the

USPS:

> shall be operated as a basic and fundamental service provided to the people by
> the government of the United States, authorized by the Constitution, created by
> Act of Congress, and supported by the people. The Postal Service shall have as
> its basic function the obligation to provide postal services to bind the Nation
> together through the personal, educational, literary, and business
> correspondence of the people. It shall provide prompt, reliable, and efficient
> services to patrons in all areas and shall render postal services to all
> communities.

183.  39 U.S.C. § 101(a). And section 401(2) provides that the USPS may "adopt, amend, and

repeal such rules and regulations, not inconsistent with this title, as may be necessary in

the execution of its functions under this title."

184.  Moreover, Congress established the Postal Service as "an independent establishment of

the executive branch," removed from the President's Cabinet and governed by a Board of

Governors. 39 U.S.C. §§ 201, 202. The Board of Governors directs "[t]he exercise of the

power of the Postal Service," *id.* § 202(a)(1), and the Postmaster General exercises

operational authority only "as directed by the Board," not the President, 39 C.F.R. §

221.5(a)(3).

185.   This governance structure reflects Congress's deliberate decision to insulate postal operations from direct presidential control and to vest policymaking authority in an independent, bipartisan body. *See* H.R. Rep. No. 91-1104, at 2-4, 11 (1970).

186.   Consistent with that structure, Congress established a comprehensive statutory framework governing the development and regulation of postal policy. Policy changes that "generally affect service on a nationwide or substantially nationwide basis" must originate with the Postal Service and be submitted to the Postal Regulatory Commission (PRC) for independent review through a public, on-the-record proceeding. 39 U.S.C. § 3661(b)-(c). And the PRC separately exercises independent regulatory authority through rulemakings and adjudications governed by statute and the APA. *See* 39 U.S.C. § 503; 5 U.S.C. §§ 553, 701-706. The Postal Service's rulemaking authority is limited to actions necessary to carry out its core, statutorily assigned functions, and courts have invalidated USPS regulations that lack a grounding in specific statutory authority. *See, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1175-76 (D.C. Cir. 2003); *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972-73 (D.C. Cir. 2022).

187.   The Order tosses aside Congress's scheme and contravenes the USPS's statutory authority on multiple fronts. Section 3(b) of the Order provides, in relevant part, that "the Postmaster General is hereby directed to initiate a proposed rulemaking pursuant to 39 U.S.C. § 401 and other applicable authority within 60 days" and further directs the "proposed rulemaking shall include, at a minimum," policies:

- governing how "all outbound ballot mail must be mailed";

- requiring that, "no fewer than 90 days prior to a Federal election," a State must notify the Postal Service if it intends to use the mail for absentee or mail-in ballots and indicate whether it will provide "no fewer than 60 days before the election," a list of voters "eligible to vote" who will receive such ballots;

- specifying that the Postal Service "shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list";

- mandating that the Postal Service "shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State"; and

- "enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election." Exec. Order No. § 3(b).

188. The Order does not merely direct a rulemaking in the general subject area of election integrity; it explicitly commands the Postmaster General to reach specific policy conclusions. Like the rejected Executive Order on documentary proof of citizenship ("DPOC"), "there is no mystery about what [the Order] purports to require or whether [the Order] purports to require it." *LULAC*, 780 F. Supp.3d at 184. Like the DPOC Executive Order, the Order here "purports to . . . dictate the precise contents of the new rule." *Id.* The Order "leaves no uncertainty about what it requires" from the Postmaster General. *Id.*

189. Section 3 of the Order violates Congress's design by purporting to direct the Postmaster General to initiate rulemaking and to implement specified policies governing election-related mail. Not only does the President lack authority to compel the Postal Service to initiate rulemaking or dictate the substance of postal policy, but the Postmaster General, the Postal Service, nor the PRC can take any action that exceeds the scope of their constitutional or statutory authority. *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 291 (2013) ("Both [agencies'] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*."); *Louisiana Pub. Serv. Comm'n v.*

*F.C.C.*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). By directing the Postmaster General to take such actions, the Executive Order bypasses the statutory processes set forth in 39 U.S.C. § 3661, displaces the independent judgment of the Board of Governors, and effectively predetermines the outcome of any required proceedings before the PRC.

190.	The Executive Order is also unlawful because it relies on 39 U.S.C. § 401 as a source of authority for the contemplated rulemaking, but that provision does not authorize the Postal Service to impose eligibility-based conditions on the delivery of mail. Section 401 grants general operational authority to provide postal services and adopt the rules necessary to carry out those functions, not to regulate voter eligibility or condition delivery in compliance with federal verification requirements. To the contrary, the Postal Service is prohibited from making "any undue or unreasonable discrimination among users of the mails" or granting "any undue or unreasonable preferences." 39 U.S.C. § 403(c). Conditioning the transmission of mail-in ballots on an individual's inclusion on a federally prescribed eligibility list would constitute precisely the kind of discrimination the statute forbids.

191.	Plaintiffs will suffer irreparable injury if Section 3 is not declared unlawful and enjoined, because Section 3 will undermine and disrupt mail voting, a method of voting relied upon by Plaintiffs and for Common Cause and NAACP, also their members, and threatens the disenfranchisement of eligible voters through unlawful federal interference with ballot transmission and election administration.

192. Because Section 3 of the Executive Order purports to control the development and substance of postal policy, direct the actions of an independent agency, and require actions beyond the Postal Service's statutory authority, it is *ultra vires* and unlawful.

**COUNT VI: AGENCY ACTION CONTRARY TO THE PRIVACY ACT**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**(Defendants DHS, USCIS, SSA, Mullin, Edlow, Bisignano)**

193. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

194. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

195. The Privacy Act governs federal agencies' collection, maintenance, use, and dissemination of records about individuals. 5 U.S.C. § 552a.

196. The Privacy Act generally prohibits an agency from disclosing "any record which is contained in a system of records" to "any person, or to another agency," absent "a written request by, or with the prior written consent of, the individual to whom the record pertains," unless a statutory exception applies. 5 U.S.C. § 552a(b). One such exception is for a "routine use." 5 U.S.C. § 552a(b)(3).

197. A "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5).

198. The Privacy Act defines a "record" broadly to mean "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or

employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(4).

199. The Privacy Act defines "routine use" narrowly to mean, "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7).

200. When an agency establishes or revises a system of records, the Privacy Act requires publication in the Federal Register of a system-of-records notice, or "SORN," describing, among other things, the categories of individuals and records in the system and "each routine use of the records contained in the system, including the categories of users and the purpose of such use." *Id.* § 552a(e)(4).

201. The Privacy Act requires each agency maintaining a system of records to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

202. The Privacy Act likewise requires each agency, "prior to disseminating any record about an individual to any person other than an agency," to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(e)(6). The Act requires advance notice of "any new use or intended use of the information in the system." *Id.* § 552a(e)(11).

203. The Executive Order directs DHS, acting through USCIS and in coordination with SSA, to compile, maintain, and transmit to each State's chief election official a "State Citizenship List" of persons purportedly confirmed to be United States citizens, at least eighteen years old by the time of an upcoming federal election, and resident in the

relevant State. The Order directs that the list be derived from federal citizenship and naturalization records, SSA records, SAVE data, and other relevant federal databases, and that SSA provide the citizenship and identity data necessary to support this effort.

204. Implementing the Order requires Defendants to retrieve records from multiple existing federal systems of records, compare and combine those records for a new election-related purpose, compile a state-specific list of individuals purportedly eligible to vote, maintain that list, and then disclose that list to state election officials.

205. The interagency disclosures required to compile the State Citizenship Lists and the external disclosures of those Lists to state election officials fall within the Privacy Act's general prohibition on disclosure.

206. The Order directs Defendants to disclose those records to other agencies and to state election officials without the request or consent of the individuals whose records are being used and disclosed.

207. No existing published routine use authorizes DHS, USCIS, SSA, or other agencies maintaining the component records to disclose those records for the purpose of creating and transmitting state-specific citizenship lists for use in state election administration.

208. Nor could the routine-use exception apply. Using immigration, naturalization, Social Security, and related federal records to generate and send state-specific citizenship lists to state election officials for use in connection with voter eligibility and ballot access is not "for a purpose which is compatible with the purpose for which [the record] was collected." 5 U.S.C. § 552a(a)(7). Records collected for administering immigration status, naturalization, Social Security numbers, and Social Security benefits are not collected for

the purpose of creating and transmitting election-related citizenship lists to state election officials.

209. The Order also requires DHS to establish or revise a system of records, so Defendants may not proceed without complying with the Privacy Act's notice and publication requirements. But no SORN has been published for the new system of records, nor has any required publication been made in the Federal Register regarding the intended or routine uses of the information in that new system.

210. The State Citizenship List further violates the Privacy Act's accuracy requirements. As alleged above, the source data specified in the Executive Order is incomplete, outdated, and error-prone for determining present citizenship and present state residence for voting purposes. SSA did not consistently maintain citizenship information for many older citizens, does not automatically update citizenship status after naturalization, and does not maintain definitive citizenship data. SAVE likewise contains known inaccuracies and omissions and is not a comprehensive list of currently eligible citizen voters in each State. And because the Executive Order requires disclosure of State Citizenship Lists at least sixty days before federal elections, the Lists will predictably contain stale residence and citizenship information for individuals who move or naturalize in the interim.

211. For all these reasons, Defendants' actions to compile, maintain, use, and transmit the State Citizenship Lists are "not in accordance with law," are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and are "without observance of procedure required by law." 5 U.S.C. § 706(2).

212. This unlawful compilation, maintenance, use, and dissemination of State Citizenship Lists injures Plaintiffs and their members by invading protected privacy interests,

increasing the risk that eligible voters will be wrongly excluded from voter rolls or ballot-distribution processes, and forcing Plaintiffs to divert resources to educate voters, assist voters in correcting federal records, and respond to the consequences of Defendants' unlawful conduct.

213. The Order explicitly commands Defendants to undertake specific actions and to reach specific policy conclusions. Like the rejected Executive Order on documentary proof of citizenship ("DPOC"), "there is no mystery about what [the Order] purports to require or whether [the Order] purports to require it." *LULAC*, 780 F. Supp.3d at 184. Like the DPOC Executive Order, the Order here "purports to . . . dictate the precise contents of the new rule." *Id.* The Order "leaves no uncertainty about what it requires" from Defendants. *Id.*

214. Plaintiffs are entitled to declaratory and injunctive relief under the APA, including an order declaring unlawful and setting aside agency action implementing the Executive Order and enjoining Defendants from compiling, maintaining, using, disclosing, or transmitting the State Citizenship Lists it contemplates.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court exercise its equitable authority to grant the following relief:

1. Declare that the President's orders in Exec. Order §§ 2(a), 3(b), 4(a), and 4(c) are *ultra vires* and legally void;

2. Declare that the President's orders in Exec. Order §§ 3(b) and 4(a) violate the constitutional separation of powers and are not enforceable;

3.      Declare that the President's orders in Exec. Order §§ 3(b) and 4(a) violate the vertical separation of powers and the Tenth Amendment to the U.S. Constitution and are not enforceable;

4.      Declare that the President's orders in Exec. Order §§ 2(a), 3(b), 4(a), and 4(c) violate the First and Fifth Amendments to the U.S. Constitution and are not enforceable;

5.      Declare that the President's orders in Exec. Order §§ 2(a), 4(a), and 4(c), and any agency action taken to implement those provisions, violate the Administrative Procedure Act and the Privacy Act, and are "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (C), (D), including because they require the unlawful collection, use, and disclosure of records in violation of 5 U.S.C. § 552a;

6.      Preliminarily and permanently enjoin implementation of the Executive Order;

7.      Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable laws; and

8.      Grant all such other and further relief as the Court may deem just and proper.

By:    /s/ John A. Freedman
John A. Freedman (Bar No. 453075)
Jeremy C. Karpatkin (Bar No. 980263)
Elisabeth S. Theodore (Bar No. 1021029)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
elisabeth.theodore@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
*Attorneys for Plaintiffs*

Sydney Lopes (Bar No. 61389)*
ARNOLD & PORTER KAYE SCHOLER LLP
U.S. Bank Center
1420 5th Avenue, Suite 1400
Seattle, WA 98101
sydney.lopes@arnoldporter.com
*Attorney for Plaintiffs*

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No. 90010714)*
Catherine Meza (Bar No. 1045688)*
Javon Davis (Bar No. 90017436)*
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
+1 202.662.8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommitte.org
*Attorneys for Plaintiff*

-69-

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
4805 Mt Hope Drive
Baltimore, MD 21215
Tel: (202) 463-2940
*Attorneys for NAACP*

*\*Motion for Pro Hac Vice or Court Admission
Forthcoming*

Dated: April 3, 2026